## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JEREMY J. BENTLEY,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:20cv00026 |
| | ) | **REPORT AND** |
| **KILOLO KIJAKAZI,**[1] | ) | **RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Jeremy J. Bentley, ("Bentley"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bentley protectively filed his application for DIB on October 19, 2017, alleging disability as of January 9, 2017, based on Marfan syndrome,[2] attention deficit hyperactivity disorder, ("ADHD"), and memory loss. (Record, ("R."), at 12, 173-74, 203, 236.) The claim was denied initially and upon reconsideration. (R. at 101-03, 108-11, 113-15.) Bentley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 116-17.) The ALJ held a hearing on August 20, 2019, at which Bentley was represented by counsel. (R. at 31-74.)

By decision dated October 2, 2019, the ALJ denied Bentley's claim. (R. at 12-25.) The ALJ found that Bentley met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2022. (R. at 14.) The ALJ found that Bentley had not engaged in substantial gainful activity since January 9, 2017,[3] the alleged onset date. (R. at 14.) The ALJ determined that Bentley had severe impairments, namely Marfan syndrome; obesity; ADHD; anxiety; and autism, but

---

[2] Marfan syndrome is a "congenital disorder of connective tissue characterized by abnormal length of the extremities, especially the fingers and toes, subluxation of the lens, cardiovascular abnormalities (commonly dilation of the ascending aorta), and other deformities." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1638 (27th ed. 1988).

[3] Therefore, Bentley must show that he was disabled between January 9, 2017, the alleged onset date, and October 2, 2019, the date of the ALJ's decision, to be eligible for benefits.

she found Bentley did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ found Bentley had the residual functional capacity to perform simple, repetitive, unskilled, light[4] work that required no more than frequent pushing/pulling; no more than the frequent performance of postural activities, except for the occasional climbing of ladders, ropes or scaffolds; no more than frequent reaching overhead with the right upper extremity; no more than occasional exposure to machinery and heights; no work involving vibrations; no concentrated exposure to extreme temperatures and excess humidity; no more than occasional interaction with the general public; no more than frequent to occasional interaction with co-workers and supervisors; and no fast-paced production work. (R. at 18.) The ALJ found that Bentley could attend, persist and concentrate for two-hour segments, with normal breaks as allowed by the employer, and could complete a normal eight-hour workday and 40-hour workweek; he could respond appropriately to supervision and work situations; any time off task would be accommodated by normal breaks; and he would require static work duties with any changes explained. (R. at 18.) The ALJ found that Bentley was unable to perform his past relevant work. (R. at 23.) Based on Bentley's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Bentley could perform, including those of an office helper, a nonpostal mail clerk and a night cleaner. (R. at 24-25.) Thus, the ALJ concluded Bentley was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2020).

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

After the ALJ issued her decision, Bentley pursued his administrative appeals, (R. at 168-71), but the Appeals Council denied his request for review. (R. at 1-5.) Bentley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Bentley's motion for summary judgment filed April 8, 2021, and the Commissioner's motion for summary judgment filed May 10, 2021.

## II. Facts

Bentley was born in 1974, (R. at 37, 173), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a college education with a bachelor's degree in business and past work experience as a customer service representative at a call center. (R. at 37, 63, 204, 220, 665.) Bentley testified he was diagnosed with Marfan syndrome as a "young boy," and he was later diagnosed with ADHD in the 1990s. (R. at 50-51.) Specifically, he testified he underwent a psychological evaluation while in school for ADHD due to symptoms of anxiety, easy distraction and inability to stay focused and concentrate. (R. at 49.) Bentley stated he was never prescribed medication for ADHD due to his heart condition. (R. at 50.) Although Bentley worked at the call center for 15 years, he testified there was never a year he was not placed on probation or subjected to job counseling, and he underwent job training more than once. (R. at 59-60.) Specifically, Bentley stated his conversations sometimes lasted longer than was acceptable, and he sometimes became distracted. (R. at 60.)  He testified he was terminated because he was not "keeping up [his] stats." (R. at 40-41.) He testified he had tutors during college to help with his work, he had a difficult time paying attention in class, and he required reminders when assignments were due. (R. at 54-55.) He stated his parents worked with him daily

during elementary school and high school to ensure his work was completed properly. (R. at 55.) Bentley testified he had been working about 10 hours weekly at a Dollar General store for a little more than a year, running the cash register and occasionally stocking and doing other "light stuff." (R. at 37-39.) He testified he was tired at the end of the workday, and his pace was a lot slower. (R. at 53.) He testified he could not work full-time due to his short attention span and easy distraction, as well as difficulty standing, which caused back and foot pain after about 40 minutes, which he thought was associated with his Marfan syndrome. (R. at 41-43, 57.) Bentley stated he slowed down to a "moderate pace" after being at work for about 30 to 40 minutes. (R. at 57-58.) However, he stated he could not continue at a moderate pace for very long, and he became slower as the night progressed. (R. at 58.) Bentley stated he could walk for up to 10 minutes and stand for up to 40 minutes before experiencing pain, but he was taking no medication for pain. (R. at 41-43.) He stated he became "fidgety" when sitting, and he could not lift more than 25 pounds due to his heart condition. (R. at 37-38, 42.) Bentley testified he was taking a heart medication and cholesterol medicine. (R. at 43.)

Bentley testified that he had never lived with anyone other than his parents, and his mother washed his clothes, but he could prepare microwave meals, fold laundry, take out the garbage, empty and load the dishwasher and drive himself to work, which took about three to five minutes. (R. at 44.) He stated he had driven in unfamiliar places by himself only a couple of times over the prior 10 years. (R. at 55-56.) He stated he did not shop very often, but he volunteered at church helping to clean, he went bowling about once weekly, and he went out to eat at restaurants with his parents on days he was not working. (R. at 44-46.) Bentley testified he watched television the majority of the days he was not working, but he got "fidgety," and flipped among the channels during every commercial break. (R. at 45, 54.) He

stated he did not visit friends because they did not live near him, and no friends visited him. (R. at 48.) Bentley stated he did not have many friends in school and stayed to himself most of the time. (R. at 48-49.) He stated he could not perform the Dollar General job full time due to a short attention span and tiring easily. (R. at 46.) Bentley stated he was not taking any mental health medications. (R. at 47-48.) He noted that consultative psychological examiner Fields diagnosed him with autism spectrum disorder. (R. at 51.) Bentley testified he read the Bible daily, but he could only read a little bit at a time and had difficulty comprehending. (R. at 58-59.)

Asheley Wells, a vocational expert, also was present and testified at Bentley's hearing. (R. at 62-71.) Wells classified Bentley's past work as a telephone representative as semi-skilled, sedentary[5] work, and his current part-time job as a cashier as unskilled, light work. (R. at 63-64.) Wells was asked to consider a hypothetical individual of Bentley's age, education and work history, who could perform light work that required no more than frequent pushing and pulling, climbing of ramps and stairs, balancing, kneeling, crawling, stooping, crouching and reaching overhead with the right upper extremity; that did not require concentrated exposure to extreme temperatures and excess humidity; that required no more than occasional exposure to hazardous machinery, work at unprotected heights and climbing ladders, ropes or scaffolds; and that did not require working on vibrating surfaces. (R. at 64.) Wells testified that such an individual could perform Bentley's past work as a telephone representative, as well as other jobs existing in significant numbers in the national economy, including those of an office helper, a nonpostal

---

[5] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

mail clerk and a packing line worker. (R. at 65.) Wells was asked to consider the same hypothetical individual, but who was limited to understanding, remembering and carrying out simple instructions in repetitive, unskilled work; who could attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer; who could complete a normal eight-hour workday/40-hour workweek involving occasional interactions with the general public and frequent to occasional interaction with co-workers and supervisors; who could respond appropriately to supervision and co-workers in usual work situations; whose time off task may be accommodated during normal breaks; who could not work in a fast-paced environment such as an assembly line setting; and who would be explained any duty changes. (R. at 66.) Wells testified this individual could not perform Bentley's past work as a telephone representative, but could perform the office helper and nonpostal mail clerk jobs previously cited, as well as the job of a night cleaner, all existing in significant numbers in the national economy. (R. at 66-67.) Wells next testified that the same hypothetical individual, but who also would be off task from 11 to 20 percent of any workday or who would miss two or more workdays monthly, could perform neither Bentley's past work nor any other competitive work. (R. at 67.) Wells testified that the average employer would tolerate an employee being placed on probation only once or twice. (R. at 69.) Wells also testified that, if an individual was markedly impaired in the ability to relate to co-workers, to deal with the public and to interact with supervisors, such that it resulted in unsatisfactory work performance, it usually would not be tolerated in a standard work environment. (R. at 69-70.)

In rendering her decision, the ALJ reviewed records from Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Bert

Spetzler, M.D., a state agency physician; Wellmont CVA Heart Institute, ("Wellmont CVA"); Wellmont Medical Associates, ("WMA"); Dr. Lucinda Feldman, M.D.; Lonesome Pine Hospital, ("Lonesome Pine"); Wellmont Cardiology Services; Mountain View Regional Medical Center, ("Mountain View"); Ron Kennedy, Ed.S.; Dr. Samuel Deel, D.O.; Johnson City Eye Clinic; and Melinda Fields, Ph.D., a licensed psychologist.

An abdominal aorta ultrasound, dated October 6, 2016, showed no evidence of ectasia[6] or aortic aneurysm, and there were normal findings of the abdominal aorta and iliac arteries. (R. at 402.) Bentley saw his primary care provider, Dr. Samuel Deel, D.O., at WMA, on March 9, 2017, noting he had recently lost his job and inquiring whether he could get disability benefits. (R. at 351.) Dr. Deel noted Bentley's history of chronic hyperlipidemia without chest pain or shortness of breath, being treated with statin therapy without compliance issues. (R. at 351.) He also noted Bentley's cardiac problems of mitral valve prolapse[7] and dilated aortic root without abdominal pain, chest pain or neck pain. (R. at 351.) Bentley's current medications included Tenormin, Lipitor and Pravachol. (R. at 351-52.) He denied chest pain and palpitations, back pain, neck pain or stiffness and dysphoric mood, and he was not nervous or anxious. (R. at 353.) On physical examination, Bentley was fully oriented with a normal heart rate and sounds without murmur; normal respiratory effort and breath sounds with no respiratory distress and no chest

---

[6]     Aortic     ectasia     refers     to     dilatation     of     the     aorta.     *See* pubs.rsna.org/doi/10.1148/rg.297095048 (last visited Aug. 24, 2021).

[7] Mitral valve prolapse is a condition in which the two valve flaps of the mitral valve do not close evenly, but bulge upward into the left atrium. When the heart pumps, part of one or both flaps collapse backward into the left atrium, sometimes allowing a small amount of blood leak backward through the valve, which might cause a heart murmur. *See* heart.org/en/health-topics/heart-valve-problems-and-diseases/heart-valve-problems-and-causes/problem-mitral-valve-prolapse (last visited Aug. 24, 2021).

tenderness; normal musculoskeletal range of motion and no edema; and a normal mood, affect, behavior, judgment and thought content. (R. at 353.) Dr. Deel diagnosed Marfan syndrome, mitral valve prolapse, hyperlipidemia and aortic ectasia. (R. at 353-54.)

Bentley saw Wendy G. Fields, N.P., a nurse practitioner at Wellmont CVA, on June 21, 2017, for a cardiology follow up. (R. at 294.) Fields noted Bentley's history of Marfan syndrome, dilated aortic root and mitral valve prolapse, but no known coronary artery disease. (R. at 294.) She stated Bentley was doing well from a cardiovascular standpoint, and he denied chest pain or discomfort, shortness of breath on exertion or when lying down or sleeping, lower extremity edema, palpitations and fainting. (R. at 294.) She further noted Bentley was not as active as he should be, but he was compliant with his medications, which included Tenormin and Lipitor. (R. at 294.) On physical examination, Bentley was in no acute distress; breathing was nonlabored, and his lungs were clear to auscultation; he had a regular heart rate and rhythm, normal S1 and S2, no murmur, rub or gallop and nondisplaced point of maximal impulse; gait was normal with no clubbing, cyanosis or edema; radial pulses were normal; sensory and motor function were grossly intact; and he had an appropriate mood and normal judgment. (R. at 295-96.) Fields diagnosed Marfan syndrome, mitral valve prolapse, aortic ectasia and mixed hyperlipidemia. (R. at 296.) She opted to continue routine surveillance of Bentley's Marfan syndrome and mitral valve prolapse with a CT angiogram and an echocardiogram, and she continued him on statin therapy. (R. at 296.) Fields advised Bentley to follow up in one year. (R. at 296.) The CT angiogram of Bentley's chest and the echocardiogram were performed on July 18, 2017, at Lonesome Pine. (R.at 297-98, 305-07, 486-89.) The CT angiogram showed no evidence of emboli; no evidence of aortic dissection or aortic aneurysm; normal dimensions of the ascending aorta, arch

and descending aorta; maximum AP diameter of the ascending aorta measured 33 mm; mildly prominent aortic root measuring 41 mm, consistent with a diagnosis of Marfan syndrome and stable from an echocardiogram dated May 14, 2012; and minimal coronary artery calcifications similar to a prior study. (R. at 298.) The echocardiogram showed a normal left ventricular size with preserved left ventricular systolic function; an estimated ejection fraction of 55 to 60 percent; normal diastolic function; slight prolapse of the posterior leaflet of the mitral valve; trace to mild mitral regurgitation, but otherwise, a structurally normal mitral valve; and a normal sized aortic root. (R. at 307.) When Bentley returned to Dr. Deel on September 11, 2017, his examination continued to be normal, and his diagnoses remained the same. (R. at 359-60.) Dr. Deel ordered lab work, and he instructed Bentley to return in six months. (R. at 360.) This lab work was normal except for showing slightly low protein. (R. at 368-72.)

Bentley completed a Function Report on February 5, 2018, indicating he watched television, played computer games for short periods, read a lot, performed light household chores, including running the dishwasher and doing laundry, occasionally conversed with family, helped care for a pet cat, managed his personal care, prepared simple meals daily, like sandwiches and microwavable foods, he mowed the yard with a push mower, he went outside daily, he drove a car and could go out alone, he shopped in stores, he could pay bills, count change, handle a savings account and use a checkbook/money orders, he went bowling weekly, he worked jigsaw puzzles, he played on his tablet, he attended church services weekly, he went to restaurants regularly, he had no problems getting along with others, he followed both written and spoken instructions fairly well, his attention span depended on the topic, but he finished tasks when he started them, he got along "great" with authority figures, he did not handle stress too well, he handled changes in routine fairly well,

and he had no unusual behaviors or fears. (R. at 211-18.) Bentley also reported he did not have a social life outside of church activities, staying home mostly. (R. at 216.) He indicated his abilities to lift, to squat, to bend, to stand, to walk, to kneel, to climb stairs, to concentrate and to follow instructions, as well as his memory, were affected by his impairments. (R. at 216.) Specifically, Bentley reported he could lift no more than 25 to 30 pounds per his doctor's restrictions; he had difficulty lifting any amount of weight at all; all physical activities were extremely limited; and he could walk about 100 yards before needing to rest for 10 minutes. (R. at 216.) He indicated he was let go from his customer service representative job due to his inability to maintain the required pace and concentration levels despite his employer's attempt at accommodation. (R. at 218.)

On February 15, 2018, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial consideration of Bentley's disability claim, finding Bentley did not have a medically determinable mental impairment. (R. at 78-79.) Specifically, Saxby noted Bentley had undergone no mental health treatment, and he was taking no mental health medications. (R. at 78.) He also noted Bentley had sustained a job as a customer service representative for 17 years, his mental status examinations were normal, and his self-reported activities of daily living demonstrated only mild mental limitations. (R. at 78.)

On February 16, 2018, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical residual functional capacity assessment of Bentley, opining he could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and/or pull up to the amounts and frequencies listed

above; frequently perform all postural activities, except crouching, which he could perform on an unlimited basis; and he must avoid concentrated exposure to hazards, such as machinery and heights. (R. at 80-82.) Otherwise, Dr. Hutcheson opined Bentley had an unlimited ability to work around environmental conditions. (R. at 81.) He opined Bentley had no manipulative, visual or communicative limitations. (R. at 81.) Dr. Hutcheson noted all these limitations were based on Bentley's heart condition. (R. at 80-82.) However, he further explained that medical sources noted Bentley was asymptomatic with no reported cardiac symptoms; he denied musculoskeletal problems to his treating source; on examinations, he had a normal gait, station, range of motion and coordination; he reported an ability to drive alone, shop, mow half his lawn at a time with a push mower and that he went bowling weekly; he indicated he could not lift more than 25 to 30 pounds; he had sustained a job as a customer service representative for 17 years; and he was not prescribed any pain medication. (R. at 82.)

On March 13, 2018, Bentley advised Dr. Deel he was filing for disability benefits, primarily due to Marfan syndrome. (R. at 407.) Additionally, Bentley advised Dr. Deel he had a history of ADHD that went untreated due to his aortic ectasia and the need to keep his heart rate low. (R. at 407.) However, Dr. Deel noted Bentley was able to perform "at least to level of keeping job for years." (R. at 407.) A review of symptoms, again, was negative, including no respiratory, cardiovascular, musculoskeletal or psychiatric complaints. (R. at 408-09.) On examination, Bentley was fully oriented; he had a normal heart rate and rhythm without murmur; breathing effort was normal, as were breath sounds, there was no respiratory distress, and he exhibited no chest tenderness; he had a normal range of musculoskeletal motion without any edema; coordination was normal; and he had a normal mood, affect, behavior, judgment and thought content. (R. at 409.) His

diagnoses remained the same, except adult ADHD was added. (R. at 409-10.) Dr. Deel referred Bentley to psychiatry. (R. at 410.) This same day, Dr. Deel completed a physical assessment of Bentley, opining his abilities to lift/carry, stand/walk, sit, reach, handle, feel, push/pull, see, hear and speak were not affected by his impairments. (R. at 532-34.) He opined Bentley could frequently climb, stoop, kneel, balance, crouch and crawl. (R. at 533.) Dr. Deel also opined Bentley's impairments did not cause any environmental restrictions. (R. at 534.) Dr. Deel stated, "Pt has Marfans. Cannot have physical job as impact may kill him. May have intellectual disability." (R. at 534.) He opined Bentley would miss about two workdays monthly. (R. at 534.)

Bentley returned to Nurse Practitioner Fields for a cardiology follow up on July 18, 2018, at which time he reported doing well. (R. at 491.) He remained asymptomatic. (R. at 491.) Bentley was noted to be active, although he did not exercise, and he was noted to be compliant with medications. (R. at 491.) An EKG was administered, which revealed a normal sinus rhythm with nonspecific ST T wave abnormalities. (R. at 491, 494-95.) Bentley's physical and mental status examinations remained unchanged and normal. (R. at 493.) Fields continued to diagnose mitral valve prolapse, Marfan syndrome and mixed hyperlipidemia, and she ordered a repeat CT angiogram of the chest and continued Bentley on statin therapy. (R. at 493-94.)

On March 30, 2018, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Bentley's disability claim, finding there was no evidence indicating a recent significant change in his mental status, and finding there was no evidence to substantiate the presence of a mental impairment. (R. at 91-92.) On the same day, Dr. Bert Spetzler, M.D., a state

agency physician, completed a physical residual functional capacity assessment, which mirrored that of Dr. Hutcheson. (R. at 93-95.) The only difference is in Dr. Spetzler's explanation for his exertional limitations, as he stated "Marfan's syndrome with abnormal features, but no dysfunction of joints and no severe symptoms. Dilated aortic root, but asymptomatic per cardiologist's report," as opposed to merely stating "heart condition" as Dr. Hutcheson had. (R. at 93.) However, just as Dr. Hutcheson did, Dr. Spetzler supported his findings with regard to Bentley's postural and environmental limitations by simply noting his "heart condition." (R. at 94.)

On September 13, 2018, Bentley returned to Dr. Deel for a follow-up appointment. (R. at 513.) His review of symptoms continued to be negative, and his examination was unchanged from previously. (R. at 515.) Bentley's diagnoses were unchanged, he was continued on Tenormin and Lipitor, and he was advised to return in six months. (R. at 516, 518.) When Bentley saw Dr. Deel on March 13, 2019, he reported he was working at a "dollar store." (R. at 502-03.)  Other than reporting that his feet got tired, he voiced no new issues. (R. at 503.) His review of symptoms was, again, negative, and his examination was normal, including, among other things, normal cardiovascular, pulmonary/chest, musculoskeletal and psychiatric findings. (R. at 504-05.) Dr. Deel's diagnoses remained the same, he ordered a CT angiogram of Bentley's chest, and he was advised to return in six months. (R. at 505.) This CT angiogram, dated March 26, 2019, revealed no abnormalities of the pulmonary arteries and no focal pulmonary lesions. (R. at 521.) The dimensions of the aortic root were stable at 41 mm from the July 18, 2017, measurements, and there was no evidence of aneurysm or dissection of the ascending aorta, arch or descending aorta. (R. at 521.) Bentley saw Melinda A. Wright, N.P., a nurse practitioner for Dr. Deel, on April 30, 2019, with complaints of intermittent, sharp

right shoulder pain of one week's duration, which he rated as a seven on a 10-point scale. (R. at 632-34.) He endorsed associated limited range of motion, but denied an inability to bear weight, joint locking, joint swelling, numbness or stiffness. (R. at 632.) On examination, he had a decreased range of motion of the right shoulder, with tenderness and bony tenderness. (R. at 634.) However, Bentley exhibited normal pulse and normal strength, and the remainder of his examination continued to be completely normal. (R. at 634.) Acute right shoulder pain was added to his diagnoses, he was prescribed 800 mg ibuprofen, he was instructed on home exercises, and x-rays were ordered. (R. at 634-35, 638-41.) These x-rays of Bentley's shoulders, dated May 6, 2019, showed no acute abnormalities, but significant calcific tendinitis was noted, with the right shoulder being worse than the left. (R. at 643-44.)

Bentley returned to Wellmont CVA on June 19, 2019, for a follow up of his Marfan syndrome and mitral valve prolapse. (R. at 646.) Dr. Shipeng Yu, M.D., Bentley's cardiologist, noted he was doing well and remained asymptomatic. (R. at 646.) It, again, was noted that Bentley was active, but did not exercise, and he was compliant with his medications. (R. at 646.) An EKG performed that day was described as "borderline," showing a normal sinus rhythm with abnormal R-wave progression, early transition. (R. at 646, 649, 651-52.) When Bentley advised Dr. Yu he was working at the dollar store, Dr. Yu instructed him to avoid "vigorous physical activity." (R. at 646.) On examination, Bentley was in no acute distress; his lungs were clear to auscultation with equal expansion and normal respiratory effort; he had a regular heart rate and rhythm, normal S1 and S2, no gallop or rub and no murmurs; strength was symmetric, and there was no clubbing, cyanosis or edema; radial and pedal pulses were +2, bilaterally; sensory and motor function was grossly intact with no focal deficits; and he displayed an appropriate mood and normal judgment. (R. at

649.) Dr. Yu noted Bentley's aortic ectasia was stable, and he planned to obtain a repeat echocardiogram in one year. (R. at 651.)

When Bentley returned to Dr. Deel on July 2, 2019, it, again, was found he was doing well, and he continued to be asymptomatic. (R. at 656.) His examination remained completely normal. (R. at 658.) Dr. Deel continued Bentley on medications, and an echocardiogram was scheduled. (R. at 660.)

Bentley saw Melinda M. Fields, Ph.D., a licensed psychologist, for a psychological evaluation on July 25, 2019, at his counsel's referral. (R. at 663-69.) Fields interviewed Bentley's father, Jack Bentley, who stated his son was diagnosed with Marfan syndrome at age nine and ADHD as a "youth." (R. at 664.) He also stated that Bentley exhibited symptoms of inattention and impulsivity both in school and at home, stating, "His mind can't focus," and "he's distracted." (R. at 664.) Jack Bentley also described his son as a "loner" who had never had a "close" friend and who sat by himself at family events. (R. at 664.) Bentley required encouragement to leave his room and sit with his parents in their living room. (R. at 664.) Jack Bentley described his son as terminating conversations inappropriately and being "lost with social cues," further stating, "he can't carry on a conversation." (R. at 664.) He also stated his son did not show emotion and never displayed tearfulness or sadness. (R. at 664.) However, when he displayed interest in a particular activity or topic, it was to the exclusion of all other activities and topics. (R. at 664.) Jack Bentley stated his son "doesn't have common sense," noting he selected clothing that was weather-inappropriate, did not fit or did not match. (R. at 664.) Finally, he noted that Bentley had an overreactivity to noise and touch, as well as an excessive need for structure. (R. at 664.)

Bentley denied a history of mental health treatment, but he noted he was tested for ADHD while in school. (R. at 665.) He endorsed inattention and difficulty focusing, which historically impacted his functioning at both school and home. (R. at 665.) Bentley denied depressive or anxiety-related symptoms, concerns with social functioning and psychotic processes, and he denied suicidal or homicidal ideations. (R. at 665.) He graduated from high school in regular classes, and he was not retained. (R. at 665.) He kept to himself, but he denied behavioral concerns. (R. at 665.) Bentley obtained a bachelor's degree in business, but, according to his father, "it took him 6 years and his mother helped him the whole way." (R. at 665.) Bentley obtained his driver's license without assistance and was capable of driving himself. (R. at 665.)

Fields noted Bentley had work experience as a customer service representative, managing inbound calls, for 15 years, but he was terminated when "they said [his] stats were meeting up." (R. at 665.) Jack Bentley reported, "out of the blue, he showed up and they said the didn't need him anymore." (R. at 665.) Bentley reported he currently was working one or two shifts weekly at Dollar General since January 2018, stocking and operating the cash register. (R. at 665.) He noted his hours had progressively decreased since he was hired. (R. at 665.) Bentley reported difficulty standing at length at work due to pain. (R. at 665.)

Bentley reported always having lived at home with his parents, with whom he had a good relationship. (R. at 666.) He stated he was responsible for his personal hygiene and grooming, he prepared microwavable food, he occasionally accompanied his mother to grocery shop, he cleaned his room, and he managed his finances when employed, stating he paid his car payment and helped with other bills. (R. at 666.) Bentley stated he enjoyed watching television and coloring by number.

-17-

(R. at 666.) He stated he read the Bible, but had difficulty focusing, and he occasionally played video games. (R. at 666.) Bentley denied interacting with others via social media, texting or by phone, and he denied visiting others or receiving such visits. (R. at 666.) Bentley stated he went out to eat with his parents and attended church with them, where he "jokes with people" who are older than him. (R. at 666.) However, he reported not interacting with same age peers, and he denied involvement in civic or community activities. (R. at 666.)

Fields noted Bentley's hygiene and grooming were adequate; he was cooperative and appeared to expend adequate effort across all tasks presented; had adequate eye contact; was fully oriented; provided brief responses to direct questions in a relevant and coherent fashion; had an anxious mood, and hand tremors were noted; had a constricted affect with minimal reactivity; made clicking sounds with his tongue throughout the assessment; displayed fidgeting with frequent hand movement; stream of thought was organized and logical with no evidence of thought content impairment; there was no evidence of perceptual disturbances; judgment was impaired, as evidenced by responses to presented scenarios; insight was quite limited; immediate memory was normal, as evidenced by ability to recite four of four words upon immediate presentation; recent recall was impaired, as evidenced by ability to recite one of four words after a delay; concentration was impaired, as evidenced by Serial 3 performance; pace was slow; posture was slumped; and gait was slow. (R. at 666.) Fields administered the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), the results of which were deemed valid, and which suggested a mild level of dysphoric mood and anhedonia. (R. at 667.) She recommended social skills and assertiveness training if engagement in the therapeutic process could be established, and, consequently, she deemed his prognosis guarded. (R. at 667.) The Neurobehavioral Cognitive Status Examination,

("Cognistat"), also was administered, indicating a moderate impairment in the area of "attention." (R. at 667.) In all other areas, Bentley was either in the "average range" or had only a "mild impairment." (R. at 667.) He also completed the Adult Self-Report Scale, ("ASRS"), Symptom Checklist, which suggested the likelihood of ADHD. (R. at 667.) The Beck Depression Inventory, ("BDI"), did not indicate clinically significant depressive symptomatology, and the Beck Anxiety Inventory, ("BAI"), did not reveal clinically significant anxiety-related symptoms. (R. at 668.)

Fields diagnosed Bentley with autism spectrum disorder; ADHD; and unspecified anxiety disorder, and she deemed his prognosis guarded with appropriate treatment and environmental support. (R. at 668.) She noted that he likely would benefit from outpatient psychiatric services to address ADHD symptoms, and she suggested social skills training to aid in his interactions with others. (R. at 668.)

Also on July 25, 2019, Fields completed a mental assessment, opining Bentley was not limited in his ability to maintain personal appearance; mildly[8] limited in his ability to demonstrate reliability; moderately[9] limited in his ability to follow work rules, to function independently and to understand, remember and carry out simple job instructions; and markedly[10] limited in his ability to relate to co-workers, to deal with the public, to use judgment in pubic, to interact with supervisors, to deal with

---

[8] A mild limitation is defined on this assessment as a "slight limitation …, but the individual can generally function well." (R. at 670.)

[9] A moderate limitation is defined on this assessment as "more than a slight limitation … but the individual is still able to function satisfactorily." (R. at 670.)

[10] A marked limitation is defined on this assessment as a "serious limitation … [causing] substantial loss in the ability to effectively function – resulting in unsatisfactory work performance." (R. at 670.)

work stresses, to maintain attention/concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 670-72.) Fields stated she was basing these findings on Bentley's impaired judgment, limited insight, impaired recent recall, significantly impaired social functioning and impaired concentration. (R. at 671-72.) She opined Bentley would miss more than two workdays monthly. (R. at 672.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715

F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bentley argues that the ALJ erred by improperly determining his residual functional capacity by failing to appropriately consider the opinion evidence of record. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, (Plaintiff's Brief), at 4-6.) In particular, Bentley argues the ALJ erred by rejecting the "uncontested [and] up to date" opinions of Dr. Deel, his treating physician, and psychologist Fields, in favor of the "stale [and] outdated" opinions of the nonexamining state agency reviewers. (Plaintiff's Brief at 6.)

In his brief, Bentley refers to 20 C.F.R. § 404.1527(d)(2) when arguing that the ALJ erred in his weighing of the opinion evidence of record. However, because this matter involves a claim filed after March 27, 2017, the new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the

evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[11]

Instead, an ALJ must consider and articulate how *persuasive* he finds all of the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

---

[11] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[12] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

---

[12] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

The ALJ found that Bentley had the residual functional capacity to perform simple, unskilled, repetitive, light work that required no more than frequent pushing/pulling; no more than the frequent performance of postural activities, except for climbing ropes, ladders or scaffolds, which he could occasionally perform; that required no more than frequent reaching overhead with the right upper extremity; that did not require concentrated exposure to temperature extremes and excess humidity; that required no more than occasional exposure to machinery and heights; that did not require working around vibrations; that required no more than occasional interaction with the general public and no more than frequent to occasional interaction with co-workers and supervisors; and that required no fast-paced production requirements, instead requiring static work duties, with any changes explained. The ALJ found Bentley could attend, persist and concentrate for two-hour segments, with normal breaks as allowed by the employer, and he could complete a normal eight-hour workday and 40-hour workweek; he could respond appropriately to supervision and work situations; and any time off task would be accommodated by normal breaks. (R. at 18.)

In making this residual functional capacity finding, the ALJ applied the new regulations. As stated above, under these regulations, and contrary to Bentley's

argument, the ALJ may not defer to a claimant's treating physician, and an ALJ is not required to assign any specific evidentiary weight to any medical opinion contained in the record. *See* 20 C.F.R. § 404.1520c(a). Instead, as explained above, the ALJ must evaluate the persuasiveness of a medical opinion based on its supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). For the reasons that follow, I find this is what the ALJ did. With regard to the mental opinion evidence, Bentley argues the ALJ erred by rejecting the opinion of one-time examining consultative psychological examiner Fields in favor of the nonexamining state agency psychologists. First, I find that, contrary to Bentley's argument, the ALJ did not reject the opinion of Fields in favor of those of the state agency psychologists. In fact, the ALJ explicitly stated in her decision that she found the opinions of the state agency psychologists, Saxby and Milan, both of whom found the existence of no medically determinable mental impairment, to be "less persuasive," given Fields's examination, which "revealed longstanding ADHD and autism disorder." (R. at 22.) Thus, the ALJ found their opinions were not consistent with this other record evidence, despite the historical medical records showing consistently normal mental status findings with normal orientation, mood, affect, behavior, judgment and thought content. (R. at 22.)

With regard to Fields's opinion, the ALJ found her objective examination findings to be "persuasive," while the severity of the limitations she assigned to Bentley as a result of these findings to be "less persuasive." (R. at 22.) In July 2019, Fields performed a one-time consultative examination at the request of Bentley's counsel. Objective examination findings included the following: adequate hygiene and grooming; he was cooperative and expended adequate effort; eye contact was adequate; he was fully oriented; he provided brief answers to direct questions in a relevant and coherent fashion; stream of thought was organized and logical with no

evidence of thought content impairment; there was no evidence of perceptual disturbances; and immediate memory was normal. (R. at 666.) Abnormal findings included an anxious mood with hand tremors; a constricted affect with minimal reactivity; tongue clicking, fidgeting and frequent hand movement; impaired judgment; quite limited insight; impaired recent recall; impaired concentration; and slow pace. (R at 666.) The MMPI-2 indicated a mild dysphoric mood and anhedonia; Cognistat testing indicated moderate impairment in attention, but all other areas were either average or mildly impaired; and neither the BDI nor the BAI suggested clinically significant depressive or anxiety-related symptomatology. (R. at 667-68.) As stated above, the ALJ found these objective examination findings to be "persuasive." Notwithstanding these normal to fairly benign objective findings, however, Fields completed a mental assessment opining Bentley was markedly limited in the majority of abilities assessed, including, among others, relating to co-workers, dealing with the public, interacting with supervisors, dealing with work stresses, maintaining attention and concentration and understanding, remembering and carrying out both detailed and complex job instructions. (R. at 670-71.) In her decision, the ALJ, found that such limitations were "less persuasive" because they were not "representative of" the objective findings. (R. at 22-23.) In other words, the ALJ found the limitations assessed by Fields were neither supported by nor consistent with her own objective examination findings. As stated above, there were several completely normal mental status examination and testing findings, and the findings that were not completely normal, still were mostly benign and did not justify the imposition of such marked limitations. Moreover, as the ALJ stated in her decision, the record indicates Bentley was in no ongoing mental health treatment, and there were no abnormal mental status findings documented throughout the record. (R. at 23.) For instance, at appointments with his treating physician, Dr. Deel, Bentley consistently denied psychiatric symptoms, and he was fully oriented with a

normal mood, affect, behavior, judgment and thought content. (R. at 353, 359-60, 409, 504-05, 515, 657-58.) Likewise, at cardiology appointments, he consistently had an appropriate mood and normal judgment. (R. at 296, 493, 649.) In a February 2018 Function Report, Bentley reported watching television, playing computer games, reading a lot, working jigsaw puzzles, playing on his tablet, attending church services, driving and shopping in stores, all of which require a certain amount of attention and concentration. Likewise, Bentley reported he could pay bills, count change, handle a savings account, use a checkbook/money orders, had no problems getting along with others, followed both written and oral instructions fairly well, finished tasks he started, got along great with authority figures and handled changes in routine fairly well. (R. at 211-18.) Bentley did state he did not handle stress too well. (R. at 217.) Thus, the ALJ appropriately found the marked limitations assessed by Fields also were inconsistent with the other evidence contained in the record.

For all these reasons, I find that substantial evidence supports the ALJ's evaluation of the opinion evidence pertaining to Bentley's mental impairment. Based on the same reasoning, I find that the ALJ's mental residual functional capacity finding also is supported by substantial evidence.

Next, with regard to his physical impairments, Bentley argues the ALJ erred by rejecting the opinion of his treating physician, Dr. Deel, in favor of those of the state agency physicians, Drs. Hutcheson and Spetzler. Again, I disagree. First, to the extent that Bentley is arguing that the opinion of Dr. Deel, as his treating physician, is entitled to more weight, this simply is incorrect. The revised regulations, which apply to Bentley's claim, eliminated the treating physician rule. In fact, as stated herein, they direct that ALJs will not assign any specific evidentiary weight to any medical opinion. *See* 20 C.F.R. § 404.1520c(a). Instead, as stated above, the ALJ

will evaluate the persuasiveness of a medical opinion based on its supportability and consistency. In March 2018, Dr. Deel completed a physical assessment of Bentley, opining his abilities to lift/carry, stand/walk, sit, reach, handle, feel, push/pull, see, hear and speak were not affected by his impairments; that he could frequently climb, stoop, kneel, balance, crouch and crawl; that his impairments did not cause any environmental restrictions; and that he would miss about two workdays monthly. (R. at 532-34.) Dr. Deel further opined that Bentley could not have a "physical job," as the "impact may kill him" due to his "Marfans." (R. at 534.) In her decision, the ALJ found Dr. Deel's opinion "mostly persuasive," with the exception of his finding that Bentley would miss about two workdays monthly, which she found "not particularly persuasive." (R. at 23.) Specifically, the ALJ stated she found Dr. Deel's opinion mostly persuasive, given objective findings that indicated normal functioning, albeit with noted and appropriate limitations due to his Marfan syndrome. (R. at 23.) The court notes that Dr. Deel's opinion is supported by the objective findings contained in his treatment notes of Bentley during the relevant time period, which demonstrate normal findings. For instance, from March 2017 to July 2019, Bentley saw Dr. Deel approximately every six months for routine appointments and treatment for his cardiac problems and hyperlipidemia. Over this time, examinations consistently yielded normal findings, including normal heart rate and sounds with no murmur; normal respiratory effort and breath sounds with no respiratory distress and no chest tenderness; normal musculoskeletal range of motion and no edema; and normal coordination. The only exception was in April 2019, when Bentley complained of right shoulder pain, and he exhibited decreased range of motion with tenderness and bony tenderness, but he had a normal pulse and normal strength. The remainder of the examination, however, was completely normal. X-rays of the shoulders showed significant calcific tendinitis, and he was treated with ibuprofen and home exercises. Nonetheless, by July 2019, Bentley voiced no complaints of shoulder pain, and his

examination was, again, completely normal. Additionally, Bentley consistently denied cardiac and musculoskeletal symptoms, with the exception of his one-time shoulder complaint, at his visits to Dr. Deel. Specifically, in addition to musculoskeletal symptoms, he denied chest pain, palpitations, shortness of breath, abdominal pain and nausea throughout this time. Thus, Dr. Deel's opinion that Bentley was not limited in his various work-related abilities is supported by his own objective findings and Bentley's asymptomatic status during the relevant time period. Additionally, as the ALJ noted, it is consistent with the other objective findings contained in the record. For instance, examinations conducted by Bentley's cardiologist, Dr. Yu, and cardiology nurse practitioner, whom he saw only on an annual basis, yielded normal findings, including clear lungs; nonlabored breathing; regular heart rate and rhythm; normal S1 and S2; no murmur, rub or gallop; a normal gait without clubbing, cyanosis or edema; symmetric strength; normal radial and pedal pulses; and grossly intact sensation and motor function. Bentley consistently was asymptomatic, denying chest pain or discomfort, shortness of breath on exertion or when lying down or sleeping, lower extremity edema, palpitations and fainting. These providers noted Bentley was doing well from a cardiac standpoint, they continued routine surveillance of his Marfan syndrome and mitral valve prolapse with radiological testing, and they continued him on statin therapy. In June 2019, Dr. Yu noted Bentley's aortic ectasia was stable, and when Bentley advised him he was working at a "dollar store," Dr. Yu instructed him only to avoid "vigorous physical activity."

Moreover, the radiological findings contained in the record, which show that Bentley's cardiac condition was stable throughout the relevant time period, are consistent with Dr. Deel's opinion that Bentley's work abilities were affected only to the extent that he could not perform a physical job due to his Marfan syndrome.

For instance, an October 2016 abdominal aortic ultrasound showed no ectasia or aortic aneurysm, and there were normal findings of the abdominal aorta and iliac arteries. A July 2017 chest CT angiogram showed no evidence of emboli, no evidence of aortic dissection or aortic aneurysm, normal aortic dimensions with only a mildly prominent aortic root measuring 41 mm, consistent with a Marfan syndrome diagnosis and stable from a May 2012 echocardiogram, and minimal coronary artery calcifications similar to a prior study. A July 2017 echocardiogram showed a normal left ventricular size with preserved systolic function; an estimated ejection fraction of 55 to 60 percent; normal diastolic function; slight prolapse of the posterior leaflet of the mitral valve; trace to mild mitral regurgitation; and a normal sized aortic root. A July 2018 EKG yielded a normal sinus rhythm with nonspecific ST T wave abnormalities. A March 2019 chest CT angiogram revealed no abnormalities of the pulmonary arteries and no focal pulmonary lesions, and the aortic root dimensions were stable from July 2017, with no evidence of aneurysm or dissection. A June 2019 EKG was "borderline," showing a normal sinus rhythm with abnormal R-wave progression, early transition. Dr. Deel's opinion further is consistent with the statements contained in Bentley's February 2018 Function Report and statements to treatment providers, including that he can perform light household chores, help care for a pet cat, manage his personal care, prepare simple meals daily, mow his yard with a push mower, go outside daily, drive places independently, shop in stores, go bowling weekly, go to restaurants regularly and attend church services regularly.

For all these reasons, I find that substantial evidence supports the ALJ's finding that Dr. Deel's opinion in this regard is mostly persuasive. Likewise, for the following reasons, I find her finding that Dr. Deel's opinion that Bentley would miss about two workdays monthly is not particularly persuasive also is supported by substantial evidence. As the ALJ stated in her decision, the records showed Bentley's

Marfan syndrome remained asymptomatic, and, overall, he was doing well with only conservative treatment and regular examination and monitoring of his condition. (R. at 23.) As stated herein, Bentley consistently denied cardiac symptoms to Dr. Deel, and cardiac examinations yielded normal findings. Thus, Dr. Deel's opinion that Bentley would miss about two workdays monthly is not supported by his own treatment notes. It also is not consistent with the other evidence in the record. For instance, Bentley's cardiologist saw fit to see him only annually, Bentley consistently denied experiencing any cardiac symptoms to his cardiologist and cardiology nurse practitioner, they indicated he was doing well from a cardiac standpoint, his condition was monitored with radiological testing, he was treated conservatively with statin therapy, and his Marfan syndrome was deemed stable. Radiological findings indicated Bentley's cardiac conditions were stable. Additionally, the ALJ correctly noted that the records detailed no acute physical findings to support Bentley's reported musculoskeletal pain, as there were no supporting radiological examinations to corroborate such allegations. The only mention of a musculoskeletal issue came in April 2019 when Bentley complained of right shoulder pain. X-rays showed calcific tendinitis, which was treated with ibuprofen and home exercises, after which Bentley made no further complaints in this regard.

In her decision, the ALJ found the opinions of the state agency physicians, Drs. Hutcheson and Spetzler, "persuasive." Both opined Bentley could perform light work with the frequent performance of postural activities, except for crouching, which he could perform on an unlimited basis; he must avoid concentrated exposure to hazards like machinery and heights; he had an unlimited ability to work around environmental conditions; and he had no manipulative, visual or communicative limitations. (R. at 80-82, 93-95.) The ALJ found these opinions "persuasive"

because the objective medical evidence, as recited above, showed stable cardiac findings and ongoing conservative treatment. (R. at 22.) Additionally, she correctly stated that physical examinations generally were negative, and regular periodic cardiac radiological examinations indicated stable pathology, Bentley was able to engage in a wide variety of activities of daily living, including performing light household chores, mowing his yard with a push mower and bowling weekly. Thus, the state agency physicians' opinions are consistent with other evidence in the record. Moreover, because Drs. Hutcheson and Spetzler noted in their reports that treatment notes indicated Bentley's heart condition was asymptomatic, he denied musculoskeletal problems, he exhibited normal musculoskeletal findings on examination, he performed various activities of daily living, and he kept a job as a customer service representative or 17 years, they were appropriately supported.

For all these reasons, I find that substantial evidence supports the ALJ's finding that the opinions of the state agency physicians were persuasive. Based on all the same evidence cited above, I find that substantial evidence also supports the ALJs physical residual functional capacity finding. The ALJ is not required to adopt a residual functional capacity assessment of a treating or examining physician in determining a claimant's residual functional capacity. *See Vikara v. Saul*, 2019 WL 4280058, at *9 (W.D. Va. Sept. 10, 2019). It is well-settled that it is the ALJ's duty to determine a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2020). In determining a claimant's residual functional capacity, an ALJ must consider all the relevant evidence, including medical records, medical source opinions and the claimant's subjective allegations and descriptions of his own limitations. *See* 20 C.F.R. § 404.1545(a)(1), (3) (2020). I find this is what the ALJ did here. Based on all the evidence cited herein, and which will not be repeated, I

find that substantial evidence also supports the ALJ's residual functional capacity finding.

For all the above-stated reasons, I find that substantial evidence exists to support the ALJ's consideration of the opinion evidence, as well as her finding that Bentley had the residual functional capacity to perform a limited range of light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Bentley was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bentley's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. §

636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:     August 25, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE